# 18-2454(L)

## 18-2623 (XAP)

### United States Court of Appeals
### for the Second Circuit

PEOPLE OF THE STATE OF NEW YORK, By Letitia James, Acting
Attorney General of the State of New York,

*Plaintiff-Appellant–Cross-Appellee*,

v.

KENNETH GRIEPP, RONALD GEORGE, PATRICIA MUSCO, RANDALL DOE,
OSAYINWENSE OKUONGHAE, ANNE KAMINSKY, BRIAN GEORGE, SHARON DOE, DEBORAH
M. RYAN, ANGELA BRAXTON, JASMINE LALANDE, PRISCA JOSEPH, SCOTT FITCHETT, JR.,

*Defendants-Appellees–Cross-Appellants*,

DOROTHY ROTHAR,

*Defendant*.

On Appeal from the United States District Court for
the Eastern District of New York

**RESPONSE BRIEF AND CROSS APPEAL FOR APPELLEES-CROSS-APPELLANTS
ANGELA BRAXTON AND JASMINE LALANDE**

Kate Oliveri
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
*Attorney for Appellees/Cross-Appellants
Angela Braxton and Jasmine LaLande*

Dated: March 5, 2019

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................2

STATEMENT OF THE ISSUES...................................................................2

The Attorney General's Appeal ...................................................................2

Defendants' Cross-Appeal/Alternative Basis for Affirming the District Court ........3

STATEMENT OF THE CASE.......................................................................3

      A.    ANGELA BRAXTON ......................................................3

      B.    JASMINE LALANDE ......................................................5

STANDARDS OF REVIEW .........................................................................5

SUMMARY OF THE ARGUMENT .............................................................5

ARGUMENT .................................................................................................6

I.    THE DISTRICT COURT CORRECTLY EVALUATED THE ATTORNEY GENERAL'S FLAWED EVIDENCE. ............................................................6

      A.    The District Court Correctly Excluded the Escort Recap Notes and PEQs. ...............................................................................7

      B.    The District Court Correctly Found That the Attorney General's Five Primary Witnesses Are Not Entirely Credible. ...................................12

i.     *Pearl Brady* ...............................................................16

ii.    *Mary Lou Greenberg* ................................................18

iii.   *Margot Garnick*........................................................19

iv.    *Theresa White* ..........................................................20

v.     *Troyd Asmus*.............................................................20

II.   THE DISTRICT COURT CORRECTLY FOUND THAT THE ATTORNEY
GENERAL IS NOT LIKELY TO SUCCEED ON THE MERITS. .............21

A.   Physical Obstruction..........................................................21

B.   Follow and Harass ..............................................................24

i.    *Jasmine LaLande* ......................................................25

ii.   *Angela Braxton* .........................................................26

C.   Force ......................................................................................27

D.   Threat of Force ....................................................................28

III.  THE DISTRICT COURT CORRECTLY DETERMINED THAT
DEFENDANTS WERE NOT LIKELY TO REPEAT ANY POTENTIALLY
UNLAWFUL CONDUCT. ..........................................................29

IV.   THE ATTORNEY GENERAL DOES NOT HAVE STANDING TO BRING
A CLAIM UNDER THE CITY ACT. ..........................................29

CONCLUSION ....................................................................................30

CERTIFICATE OF COMPLIANCE....................................................31

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Bessemer City*,
470 U.S. 564 (1985)......................................................................................8

*Cameron v. City of New York*,
598 F.3d 50 (2d Cir. 2010)....................................................................24, 28

*Chan v. Triple 8 Palace, Inc.*,
No. 03CIV6048(GEL)(JCF), 2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) .........11

*Connecticut v. Physicians Health Servs. of Conn., Inc.*,
287 F.3d 110 (2d Cir. 2002)..................................................................29, 30

*Fujitsu Ltd. v. Federal Express Corp.*,
247 F.3d 423 (2d Cir. 2001)....................................................................9

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998)..................................................................11, 12

*New York v. Cain*,
418 F. Supp. 2d 457 (S.D.N.Y. 2006) ................................................22

*New York v. Operation Rescue Nat'l*,
273 F.3d 184 (2d Cir. 2001)..................................................................22, 23

*Ottaviani v. State Univ. of N.Y.*,
875 F.2d 365 (2d Cir. 1989)....................................................................6

*Outley v. New York*,
837 F.2d 587 (2d Cir. 1988)..................................................................13

*Pettit v. Smith*,
45 F. Supp. 3d 1099 (D. Ariz. 2014) ................................................10

*Ramos v. Swatzell*,
No. ED CV 12-1089-BRO (SPx), 2017 WL 2857523 (C.D. Cal. June 5, 2017)....10

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d Cir. 2002)...............................................................9, 10, 11

*Scalera v. Electrograph Sys., Inc.*,
262 F.R.D. 162 (E.D.N.Y. 2009) ....................................................9, 10, 11

*Siani v. State Univ. of N.Y. at Farmingdale*,
No. CV09-407(JFB)(WDW), 2010 WL 3170664 (E.D.N.Y. Aug. 10, 2010) ........10

*Turner v. Hudson Transit Lines, Inc.*,
142 F.R.D. 68 (S.D.N.Y. 1991) ..............................................................11

*United States v. Dugan*,
450 F. App'x 20 (2d Cir. 2011) ..............................................................22

*United States v. Holmes*,
44 F.3d 1150 (2d Cir. 1995)....................................................................13

*United States v. Maldonado-Rivera*,
922 F.2d 934 (2d Cir. 1990)....................................................................13

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) .........................................................9, 11

## Statutes

18 U.S.C. § 248(e)(4) ............................................................................21

NYC Admin. Code § 8-803 ..........................................................*passim*

N.Y. Penal Law § 240.70(3)(d) ..............................................................21

iv

# INTRODUCTION

**"We are *not* a nation where you can choose your point of view . . . ."**
- Former Attorney General Eric Schneiderman on filing this lawsuit

With these words, the Attorney General announced to the press that his office had filed this case. And no words have yet described the theory of the Attorney General's lawsuit as well. In mid-2016, the New York Attorney General set out with a vendetta to halt "a sense of entitlement by [pro-life] protestors to run their mouths . . . [with] *unlawful*, un-American rhetoric . . . ." The Attorney General, thus, set up 24/7 surveillance videos outside Choices abortion facility in Jamaica, Queens ("Choices") on June 21, 2016 and had nine days of investigative undercover surveillance with investigators posing as patients and companions at Choices. (JA2181-2182). This investigation turned up nothing. There is not a single video showing Ms. Braxton or Ms. LaLande engaging in unlawful conduct. Ms. Braxton and Ms. LaLande peacefully share the Gospel message on the public sidewalk, engaging in protected First Amendment activity. Yet, the Attorney General sued Ms. Braxton and Ms. LaLande anyway because, according to the Attorney General, in New York you cannot choose your own point of view and the pro-life message of the Gospel is "unlawful, un-American rhetoric." The district court saw through the Attorney General's viewpoint persecution and this Court should affirm the lower court's decision.

1

## JURISDICTIONAL STATEMENT

Pursuant to Federal Rule of Appellate Procedure 28(i), Ms. Braxton and Ms. LaLande hereby adopt by reference Section II, the Jurisdictional Statement, in the Griepp Appellees-Cross-Appellants Brief due to be filed on March 5, 2019, Case Nos. 18-2454(L) & 18-2627 (hereinafter "Griepp Defendants' Brief"). With respect to jurisdiction over the cross-appeal, Ms. Braxton and Ms. LaLande hereby incorporate by reference the arguments made in their Memorandum in Opposition to Plaintiff-Appellant's Motion to Dismiss Defendants-Appellees' Cross-Appeals (Doc. 80).

## STATEMENT OF THE ISSUES

### The Attorney General's Appeal

I.   Did the district court properly exercise its broad discretion in concluding that (a) hearsay documents that conflict with video evidence and were selectively destroyed are given no weight and (b) witnesses whose testimony contains internal inconsistencies and conflicts with video evidence are "not entirely credible?

II.  Did the district court properly determine that the Attorney General is not likely to succeed on the merits of its case against Ms. Braxton and Ms. LaLande?

III. Did the district court properly exercise its discretion in finding no reasonable likelihood that any purported wrong would be repeated with respect to the

three defendants who the district court concluded potentially violated the law?[1]

**Defendants' Cross-Appeal/Alternative Basis for Affirming the District Court**

IV.    Did the district court err in determining that the Attorney General has standing to bring an action under the NYC Admin. Code § 8-803 ("City Act") when the City Act limits the scope of who can bring a suit under it and does not grant authority to sue to the Attorney General?

## STATEMENT OF THE CASE

Pursuant to Federal Rule of Appellate Procedure 28(i), Ms. Braxton and Ms. LaLande hereby adopt by reference Section IV, the Statement of the Case, in the Griepp Defendants' Brief and, in addition, add the following:

### A.    ANGELA BRAXTON

Ms. Braxton is a native of Brooklyn, New York. (JA2009). She received her bachelor's degree in business and works as a Senior Executive Assistant for one of the top executives at JPMorgan Chase. (JA2009-2010). On September 11, 2001, Ms. Braxton was on the 80th floor of 1 World Trade Center. (JA2010). Her harrowing experience as the building collapsed above her led to her conversion to Christianity.

---

[1] Ms. Braxton and Ms. LaLande do not respond to this point as neither of them are one of the three defendants who potentially violated the underlying law. The district court found that neither Ms. Braxton nor Ms. LaLande violated the underlying statutes.

(JA2012). Her experience on 9/11 also left Ms. Braxton with permanent injuries and she suffers other physical ailments, including a degenerative bone disease, bad back, damage to her rotator cuff and collar bone, and severe nerve damage. (JA2013; JA2002; JA2942-3112).

Ms. Braxton evangelizes wherever she goes and goes on evangelizing mission trips, including five Super Bowls, China, Haiti, and the Dominican Republic, which she pays for herself. (JA2015; JA2049). Ms. Braxton's faith requires her to speak the truth of the Gospel in a loving way and show Christ to the world. (JA1997). Having lost five children to miscarriages, Ms. Braxton seeks to prevent other mothers from suffering the loss of a child to abortion. (JA2010).

Ms. Braxton began spreading the Gospel message outside Choices in 2013 but stopped going to Choices in approximately April 2017. (JA2016). During the time she spent evangelizing on the public sidewalk outside Choices, Ms. Braxton spent approximately 60% to 70% of her time across the street from Choices, which, though more than 15 feet from the premises, is still captured on Choices surveillance video. (JA2019; JA2878; Ex. 136; Ex. 138). Ms. Braxton's usual practice when approaching an individual outside of Choices was to greet a person with her name, try to share the Gospel, and offer pamphlets. (JA2019-2020; JA2021; JA2005; BL Ex. 111).

## B.    JASMINE LALANDE

Jasmine LaLande is a Christian bank teller who stopped going to Choices in early 2016. (JA2009; JA2017). Ms. LaLande has never been reported to the police and Choices' security guard never reported any of Ms. LaLande's conduct to Choices' staff. (JA1374). Ms. LaLande typically stood on a public sidewalk that is sixteen feet two inches wide by the main entrance of Choices. (JA580; JA1601; JA192; JA3575). She would gently hand out literature (typically Gospel tracts) and, if asked to stop, would leave patients alone. (JA1349; JA1999; JA2005-2006; BL 111).

## STANDARDS OF REVIEW

Pursuant to Federal Rule of Appellate Procedure 28(i), Ms. Braxton and Ms. LaLande hereby adopt by reference Section V, the Standards of Review, in the Griepp Defendants' Brief.

## SUMMARY OF THE ARGUMENT

The district court correctly evaluated the Attorney General's evidence. The escort recap notes and Protestor Experience Questionnaires ("PEQs") are unreliable documents that conflict with video evidence and witness testimony. The Attorney General has not shown that excluding these documents was clear error. Additionally, the district court also correctly determined that the Attorney General's five primary witnesses are not entirely credible. "It is not the function of this court to reweigh the

evidence anew, particularly when findings by a district court are based on in-court credibility determinations." *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 375 (2d Cir. 1989).

This Court should also affirm the district court's finding that the Attorney General is not likely to succeed on the merits of its claim against Ms. Braxton and Ms. LaLande. In its brief, the Attorney General misstates the findings of the district court and misrepresents the video evidence, none of which shows Ms. Braxton or Ms. LaLande engaging in any unlawful conduct.

Finally, the district court committed clear error in finding that  Ms. Braxton and Ms. LaLande conceded that, if the Attorney General could meet the elements of the *parens patriae* test, it has standing under the City Act. Indeed, counsel for Ms. Braxton and Ms. LaLande explicitly stated otherwise at oral argument on this matter. This error led to a fundamental misapplication of the test to determine if the Attorney General has standing and, on this matter, the district court should be reversed.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY EVALUATED THE ATTORNEY GENERAL'S FLAWED EVIDENCE.

During the course of the hearing, the Attorney General presented severely flawed evidence. First, the Attorney General asks this court to reverse the district court's decision to exclude PEQs and escort recap notes with ambiguous questions written by unidentified individuals who did not testify. Second, the Attorney General

6

asks the Court to overturn the district court's determinations of witness credibility. Throughout the hearing, the Attorney General's witnesses viewed clearly innocuous videos, yet described the events depicted with outlandish descriptions that contradicted the videos. Given the grossly exaggerated and fabricated nature of the testimony, the district court was exceedingly generous in merely characterizing the witnesses as "not entirely credible." (SPA14-18).

## A. The District Court Correctly Excluded the Escort Recap Notes and PEQs.

Ms. Braxton and Ms. LaLande hereby incorporate by reference Section VII.A.2, law and arguments related to the admissibility of PEQs and Escort Recap Notes, in the Griepp Defendants' Brief and, in addition, state the following:

The Attorney General claims it was an error for the district court to assign no evidentiary weight to PEQs submitted into evidence by the Attorney General (Appellant's Brief at 35–38). The Court should reject this argument.

Choices collects PEQs from patients who come to Choices on Saturdays to solicit feedback on their experiences with protesters outside the facility. (JA898; JA1089). Choices specifically sought to collect evidence of possible illegal activity by protesters in order to seek redress. (JA1089).

Ms. Greenberg is responsible for reviewing completed PEQs and, until recently, deciding which forms to keep and which forms to destroy. (JA898–99; JA1092). Ms. Greenberg had no real system for deciding which PEQs to keep and

which ones to throw away. (JA1091). The district court repeatedly asked Ms. Greenberg for clarification of her criteria for keeping or discarding the forms, but Ms. Greenberg could not give a consistent answer. (JA899; JA901; JA1091–93). "After making non-credible statements at the preliminary injunction hearing that she had a system to determine which Protester Experience Questionnaires to keep and which to destroy, Greenberg eventually admitted that she had no system." (SPA13).

The district court received the Attorney General's PEQ exhibits into evidence with the admonition that the court would give them little weight. (JA905). Because there was no system to Ms. Greenberg's destruction of PEQs, the district court ultimately found the PEQs that survived Ms. Greenberg's reckoning are not reliably representative or typical of the responses given by Saturday Choices patients and gave them no weight at all. (SPA13). The district court's "account of the evidence" is more than "plausible in light of the record viewed in its entirety," which is all that is required to affirm. *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

Moreover, the PEQs that survived Ms. Greenberg's purge could not have helped the Attorney General in any event. Numerous PEQs indicate protestors did not try to touch patients, and that patients had no difficulty ignoring the protesters and entering the clinic. (*See, e.g.*, JA3938–3940; JA3942; JA3946). Even patients who selected Choices' pre-printed language to indicate that protesters tried to "prevent you from entering Choices" clarified that they were referring only to

attempts at persuasion through peaceful speech. (JA3938; JA3942; JA3946). Thus, any general sense of transgression by unnamed protesters the Attorney General hoped to demonstrate through the PEQs is offset by the unnamed patients who indicated a quite different experience.

Furthermore, Ms. Greenberg's haphazard destruction of PEQs raises a spoliation issue. In this Circuit, "a party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed, (2) that the records were destroyed with a culpable state of mind, and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support the claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

The duty to preserve "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "Pursuant to this obligation, 'anyone who anticipates being a party or is a party to a lawsuit may not destroy unique, relevant evidence that might be useful to an adversary.'" *Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 171 (E.D.N.Y. 2009) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)).

That Choices was a non-party is not dispositive for purposes of spoliation. Indeed, the duty to preserve runs to material non-parties who are key players to the litigation who will have evidence material to the claims at issue. *See, e.g.*, *Siani v. State Univ. of N.Y. at Farmingdale*, No. CV09-407(JFB)(WDW), 2010 WL 3170664, *7 (E.D.N.Y. Aug. 10, 2010); *see also Pettit v. Smith*, 45 F. Supp. 3d 1099, 1106 (D. Ariz. 2014) (concluding duty to preserve evidence equally applicable to non-party where non-party was not "disinterested" in outcome of litigation and was key player to claims). Moreover, "[a] non-party's spoliation of evidence may be imputed to a party who did not engage in spoliation." *Ramos v. Swatzell*, No. ED CV 12-1089-BRO (SPx), 2017 WL 2857523, *6 (C.D. Cal. June 5, 2017) (holding adverse inference appropriate for non-party's spoliation because of relationship between defendant and non-party).

The culpable state of mind factor "is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." *Residential Funding Corp.*, 306 F.3d at 108; *id.* ("The sanction of an adverse inference should be available even for negligent destruction of documents [because] [i]t makes little difference to the party victimized by the destruction of evidence whether the act was done willfully or negligently." ); *see also Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 176 (E.D.N.Y. 2009) ("The culpable state of mind requirement is satisfied in this circuit by a showing of ordinary

negligence."); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991) (same). It has also been held that, "[o]nce the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake*, 220 F.R.D. at 217.

To satisfy the relevant standard, this Circuit employs a more stringent test than the minimal requirements of Fed. R. Evid. 401. It requires that "the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Residential Funding Corp.*, 306 F.3d at 109; *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998) (same); *see also Scalera*, 262 F.R.D. at 178 (relevance is established by showing that the destroyed evidence would have been favorable to the case of the party seeking an adverse interest). Relevance can be established in two ways: (1) it can be "inferred if the spoliator is shown to have a sufficiently culpable mind," *Scalera*, 262 F.R.D. at 178, or (2) "submit[ting] extrinsic evidence tending to demonstrate the missing evidence would have been favorable to it." *Id.* However, "the burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction." *Chan v. Triple 8 Palace, Inc.*, No. 03CIV6048(GEL)(JCF), 2005 WL 1925579, *7 (S.D.N.Y. Aug. 11, 2005). "Indeed, holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would

11

subvert the prophylactic and punitive purpose of the adverse inference and would allow parties who have intentionally destroyed evidence to profit from its destruction." *Kronisch*, 150 F.3d at 128.

Ms. Greenberg spent significant time working with the State on its case against Defendants over the two years preceding the preliminary injunction hearing. (JA1089). Furthermore, Merle Hoffman and Choices consider this lawsuit to be "our case." (JA809-810; JA3476–77). Any destruction of PEQs at Choices during this time period was in violation of a clear duty to preserve.

Considering all the circumstances, under the foregoing authorities, Defendants are entitled to an adverse inference against the State with respect to the contents of the destroyed PEQs. Given the obvious unreliability of the surviving PEQs and the nonobstruction counter-narrative revealed in some of the PEQs that were saved, combined with the alternative adverse inference basis for affirmance, the Court should affirm the district court's finding that the PEQs provide no weight to the Attorney General's case.

### B.     The District Court Correctly Found That the Attorney General's Five Primary Witnesses Are Not Entirely Credible.

Ms. Braxton and Ms. LaLande hereby incorporate by reference Section VII.A.1, law and arguments related to witness credibility, in the Griepp Defendants' Brief and, in addition, state the following:

The Attorney General improperly asks this Court to overturn the credibility determinations of the district court that are well-supported by the record. *United States v. Maldonado-Rivera*, 922 F.2d 934, 972 (2d Cir. 1990) ("Assessments of the credibility of witnesses are the province of the district court and we are not entitled to overturn those assessments."). The Attorney General claims that the district court "acted improperly by categorically finding these witnesses non-credible based on their personal views about abortion . . . " (Appellant's Brief at 39). This statement is blatantly false. The district court found that the Attorney General's witnesses were not entirely credible because their testimony conflicted with video evidence and their own previous testimony. (SPA14-17). While bias is valid grounds for discrediting witness testimony, the district court credited the witnesses' bias as their motivation for their exaggerated and false statements to the court. *United States v. Holmes*, 44 F.3d 1150, 1158 (2d Cir. 1995); (SPA6); *see also Outley v. New York*, 837 F.2d 587, 594 (2d Cir. 1988) ("[A] partiality of mind is . . . always relevant as discrediting the witness and affecting the weight of his testimony.") (collecting cases). The district court actually used the witnesses' bias to the benefit of the witnesses to soften their repeated false statements as "colored by their views" rather than intentional lies. (SPA6).

The Attorney General attempts to bolster the credibility of its witnesses and criticize the credibility determination of the district court by providing a single

example where an escort's testimony was supposedly "corroborated by other witnesses . . . , documentary evidence, and videos. However, even this supposed "corroborat[ion]" demonstrated the escort, Pearl Brady, overexaggerating and misremembering details.

The incident occurred on November 12, 2016. The parties both agree that Ms. Braxton spoke to a man and woman. However, from there the stories diverge. Two witnesses and one of the witnesses' contemporaneously taken notes state that Ms. Braxton said something like "Children are a gift from the Lord." (JA2025; JA1788; JA2502). Ms. Brady, in her so-called "fully corroborated" testimony, claimed from escort recap notes that Ms. Braxton said, "You don't need to murder your baby." (JA562). The man threatened Ms. Braxton, then went into the parking lot behind Choices. (JA2025-2026). Fearful, Ms. Braxton ran up 147th place toward Jamaica Avenue, entered a store, and called the police. (JA2025-2026). The man returned from the parking lot with a handful of rocks and kicked a sign held by another pro-life advocate. (JA2025-2026; Ex. 37). There is no evidence that Ms. Braxton said more than a single sentence to the couple. The Attorney General uses the term "fully corroborated" very loosely as Pearl Brady's only testimony in this instance relating to any action by the defendants (i.e. what Ms. Braxton said) is from recap notes and is disputed by the testimony of two witnesses and the very "documentary evidence" that the Attorney General claims shows Ms. Brady's credibility. Regardless, even

14

taking Ms. Brady as credible on this incident, the Attorney General does not now, nor has it ever, contended that Ms. Braxton violated the law in this incident by saying one sentence to a man on the street. This testimony is irrelevant.

An overarching circumstance that demonstrates the lack of credibility of all the Attorney General's witnesses and the Attorney General's case as a whole is that, despite Choices having 24/7 panoramic surveillance since at least September 6, 2014, (Exs. 133 and 134), the Attorney General's 24/7 surveillance since June 21, 2016 and nine days of investigator undercover surveillance (JA2181-2182), and countless videos produced by witnesses and defendants, there is not a single video that shows *any* defendant, including Ms. Braxton and Ms. LaLande, engaging in any unlawful conduct. *See* (SPA5) ("The most problematic of the credibility issues discussed below is the tendency for the Clinic Escort Recaps, Protestor Experience Questionnaires, and OAG witness testimony to exaggerate the impropriety of the defendants' conduct and to omit mitigating circumstances. In this regard, it is notable that, despite the availability of hundreds of hours of video evidence, the OAG has not cited a single video that corroborates the witness testimony claiming near-weekly violations. Instead, the video evidence contradicts the escorts' accounts of protestor conduct on specific occasions.").

The differences in the video evidence and the testimony of the Attorney General's witnesses are not, as the Attorney General suggests, differences in

15

characterization; they are flagrant misrepresentations. Each of the Attorney General's five main witnesses made significant internal contradictions in their testimony or testified to an occurrence that was later proven false by video evidence.

        *i.*      *Pearl Brady*

Pearl Brady, the Attorney General's prime witness, created and maintained a duplicitous Facebook account to spy on several Defendants, including Ms. Braxton. For this deceit, she created a Facebook account with the fictitious identity of "Shelly Walker." (JA740). She then took a photo of a woman whom she does not know from the internet to use as her Facebook profile picture. *Id*. She filled her account with lies, including claiming that her birthplace and hometown is Saginaw, Michigan (even though neither statement is true of Ms. Brady), listing "bank teller" as her occupation (even though Ms. Brady has never been a bank teller), and listing "conservative" as her political views (even though Ms. Brady admits she would not be described as politically conservative). (JA740-41). Ms. Brady then curated her fake Facebook account, a so-called "sock puppet" account, to appeal to the Defendants by representing "Shelly Walker" as a pro-life, conservative, Christian. To lend credence to her lie, Ms. Brady "liked" various Saginaw-based businesses and sent out "a couple hundred" Facebook friend requests. (JA741; JA743). Ms. Brady also "liked" the pages of pro-life organizations as well as politically conservative figures and entities. These included National Right to Life, Alliance

Defending Freedom, Focus on the Family, the Republican National Committee, and Senator Ted Cruz. (JA741-742).

Yet, Ms. Brady took her deceit even further. She wrote out and posted a lengthy narrative about divorcing a fictional husband named "John" and "starting over." (JA748-749). Other posts by Ms. Brady wove a story about how "Shelly Walker" once had an abortion, but is now pro-life, and how she left the Baptist church. (JA749-750). Worse yet, for over a year, to advance her fraud, Ms. Brady actually engaged with individuals, posting comments to other people's pages, such as claiming to pray for them. (JA3189-3357). Once her lie looked credible, Ms. Brady sent friend requests to Ms. Braxton and another Defendant in order to view their private Facebook pages and learn information about them. (JA743-744).

Additionally, Ms. Brady attempted to interfere with other witnesses, advising them to mislead Defendants' attorneys during depositions. In a "group chat" on Facebook messenger, Ms. Brady instructed the other escort-witnesses: "Just remember: yes, no, I don't know, I don't remember, and I don't understand the question. Short answers. Don't elaborate. This is for them to get more information, and it's our job to give them as little help as possible." (JA3378).

As noted by the district court, Ms. Brady's testimony also conflicted with video evidence. (SPA14). Ample evidence in the record supports the district court's finding that Ms. Brady is not entirely credible.

### ii.    Mary Lou Greenberg

Mary Lou Greenberg works at Choices and is the director of the volunteer escort program. (JA843). Ms. Greenberg has referred to the pro-life advocates on the sidewalk outside Choices, such as Defendants, as "the decidedly real stormtroopers of a deadly serious, Christian-Fascist movement." (JA1053-1055). Ms. Greenberg has also agreed with Merle Hoffman, the owner of Choices, in characterizing such pro-life advocates as "the American Taliban." (JA1052-1053). Ms. Greenberg's disdain for the pro-life movement is so extreme that even the Choices volunteer escort leaders with whom she works regularly characterize her as being overly cautious, even paranoid about protester activity. (JA1535; JA3648). Not only have the pro-abortion escorts noted her delusions, but they also noted that Ms. Greenberg's account of what occurs outside Choices is notoriously unreliable. (JA1531-1533; JA3646).

Ms. Greenberg recanted previous sworn testimony multiple times throughout the preliminary injunction hearing. *See, e.g.*, (JA1069-1078)[2] (Ms. Greenberg admitting her previous declaration and deposition testimony were incorrect); JA908-910 (after claiming that there was a physical altercation and that a defendant "moved into [her]," admitting that, in truth, no one physically touched her). Thus, the district

---

[2] This interaction also demonstrates the "evasiveness of many of [Ms. Greenberg's] responses" noted by the district court. (SPA15).

court's determination that Ms. Greenberg is not entirely credible is well supported in the record.

### iii.    *Margot Garnick*

Ms. Garnick herself stated that she was "sure" that bias influences the perception of the escorts, including her own, with respect to the African-American pro-life advocates, which would include Ms. Braxton and Ms. LaLande. (JA1480-1481). Additionally, Ms. Garnick's testimony conflicted with video evidence and, in some instances, conflicted with her own previous testimony from day to day. For instance, on one occasion, discussing Exhibit 17, Ms. Garnick claimed that Ms. LaLande persisted in approaching a woman entering Choices on October 8, 2016. (JA1295). However, Ms. Garnick's testimony on this video changed from her testimony on February 23, 2018 to her testimony on February 27, 2018. Exhibit 17 shows Ms. LaLande interact with three patients. During her testimony on February 23, 2018, Ms. Garnick claimed that the first interaction (approximately at the one-minute mark) showed Ms. LaLande continuing to try to hand a patient a pamphlet, thereby harassing the patient. (JA1294-1295). This testimony changed on February 27, 2018 when Ms. Garnick testified that the same interaction did not show Ms. LaLande engaging in any inappropriate conduct. Thus, the record supports the district court's finding that Ms. Garnick is not entirely credible.

*iv.*      *Theresa White*

Theresa White has been an escort leader at Choices for many years and receives hourly compensation for her time. (JA1616). Ms. White admittedly has "really bad eyesight" and struggles to remember the details of events as "the days sort of run together regarding what all happened out there at the clinic over the past several years." (JA1603-1604). This is evident in Ms. White's testimony regarding a patient outside Choices on September 6, 2014. Multiple times, Ms. White claimed that a woman became violent after Ms. Braxton said something to her. (JA1599-1600; JA1640). However, when confronted with video evidence proving that Ms. Braxton was not near the woman when she became violent, Ms. White recanted her previous testimony stating that "Ms. Braxton has nothing to do with this commotion at the front door . . . . (JA1642-1644). Thus, the district court's finding that Ms. White is not entirely credible is well supported by the record.

*v.*      *Troyd Asmus*

Troyd Asmus admittedly only remembered "a few" of the defendants and could not recall dates or details. (JA1328; JA1330; JA1336; JA1338). Additionally, Mr. Asmus testified that the only improper conduct he ever saw was Defendants "shoulder checking" and "shoving paperwork at people." (JA1358). However, on cross-examination, Mr. Asmus conceded that he exaggerated these accounts as he

never saw any Defendant engage in any intentional physical contact and that the Defendants merely offered paperwork wanting people to take it. (JA1358-1359).

Therefore, the district court's findings that Ms. Brady, Ms. Greenberg, Ms. Garnick, Ms. White, and Mr. Asmus were not entirely credible is well supported by the record and this Court should uphold the district court's findings.[3]

## II. THE DISTRICT COURT CORRECTLY FOUND THAT THE ATTORNEY GENERAL IS NOT LIKELY TO SUCCEED ON THE MERITS.

### A. Physical Obstruction

Ms. Braxton and Ms. LaLande hereby incorporate by reference Section VII.B.1.a-b, law and arguments related to physical obstruction, in the Griepp Defendants' Brief and, in addition, state the following:

FACE and the NY Clinic Access Act define "physical obstruction," in relevant part, as "rendering impassable ingress to or egress from a facility that provides reproductive health services . . . or rendering passage to or from such a facility . . . unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d). General findings of fact are not sufficient to establish physical

---

[3] The district court explained why it addressed the credibility of the Attorney General's witnesses and not the credibility of the Defendants. As noted by the district court, the Attorney General has the burden of proving its case, while the defendants do not have such a burden. (SPA5). As such, the reliability of the Attorney General's witnesses is crucial to the Attorney General's attempt to carry its burden while the credibility of the Defendants is not necessary. (SPA5).

obstruction, meaning that evidence that protestors in general obstructed access to a clinic cannot support an injunction against specific defendants. *New York v. Operation Rescue Nat'l*, 273 F.3d 184, 194 (2d Cir. 2001).

Examples of conduct by a specific defendant that constitute physical obstruction are:

- A defendant kneeling intentionally in front of the door of a clinic to block it and refusing to move until police removed him. *United States v. Dugan*, 450 F. App'x 20, 22 (2d Cir. 2011);

- A defendant deliberately using her body to slow cars, including intentionally dropping an item on the ground and retrieving it in slow motion. *Operation Rescue*, 273 F.3d at 194-95;

- "[S]tanding directly in front of a patient and preventing her from approaching the clinic while [] attempt[ing] to give her literature . . . , attempting to corner women against a wall . . . , and standing directly in front of the [clinic] door and refusing to move until a security guard approaches." *New York v. Cain*, 418 F. Supp. 2d 457, 480 (S.D.N.Y. 2006).

These examples all "involve actual physical obstructions created by the defendants' bodies, as opposed to the type of 'obstructive obstructions' that might be created by protected protest activities." *Id*.

The Attorney General argues, with respect to Ms. Braxton, that walking side by side and handing pamphlets to a patient constitutes physical obstruction. However, the law of the Second Circuit is clear that, to show physical obstruction, "[t]here must be an actual obstruction." *Id.* (emphasis added); *Operation Rescue*, 273 F.3d at 195 (criticizing a district court for characterizing as physical obstruction activity that merely makes approaching a clinic unpleasant or emotionally difficult).

This Court has cautioned that, when looking to claims of obstruction, a court must be careful not to characterize legitimate protest activity—such as approaching and yelling at patients, protesting in an angry tone, and shouting at patients—as obstruction even if such activities make it "unpleasant and even emotionally difficult" to access the clinic. *Operation Rescue*, 273 F.3d at 195.

The Attorney General relies on only one video to support its allegation that Ms. Braxton physically obstructed access to Choices. (Ex. 7). However, the video shows patients walk straight into Choices unimpeded. The video show Ms. Braxton attempt to approach four individuals walking into Choices. Not once in the video does Ms. Braxton stand directly in front of a patient as the Attorney General falsely claims. The first two interactions show Ms. Braxton—standing to the side of the individuals—attempting to hand out pamphlets. (Ex. 7). These individuals do not slow their trajectory or deviate from their path. (Ex. 7). They proceed, completely unimpeded, right by Ms. Braxton, who was standing to the side. With the third

23

individual, the video only ever shows Ms. Braxton walking *behind* the individual. (Ex. 7). Finally, Ms. Braxton is so far from the fourth individual that there is a human barricade of escorts between Ms. Braxton and the individual. It is not a reasonable characterization of Exhibit 7 to claim that it shows Ms. Braxton standing directly in front of patients. Even if there was some reasonable claim that the video showed Ms. Braxton impeding a patient, it is certainly not a clearly erroneous finding by the district court that Ms. Braxton did not physically obstruct access to Choices. Exhibit 7 does not "blatantly contradict" or "so utterly discredit" the district court's findings that no reasonable factfinder could fail to believe that Ms. Braxton did not physically obstruct access to Choices. *See Cameron v. City of New York*, 598 F.3d 50, 58 (2d Cir. 2010). Thus, the Court must uphold the district court's finding of fact.

On appeal, the Attorney General does not claim that Ms. LaLande physically obstructed access to Choices.

## B.    Follow and Harass[4]

Ms. Braxton and Ms. LaLande hereby incorporate by reference Section VII.B.2, law and arguments related to the follow and harass provision, in the Griepp Defendants' Brief and, in addition, state the following:

---

[4] The district court has not yet decided if the follow and harass provision of the City Act is unconstitutional. This question is pending before the district court in Ms. Braxton and Ms. LaLande's still undecided motions to dismiss. (E.D.N.Y. ECF 57 and 75). At the preliminary injunction stage, the district court did not resolve the "thorny constitutional issues raised concerning the [City Act]." (SPA97). Should this

i.    *Jasmine LaLande*

Yet again, the Attorney General mischaracterizes the district court's findings, claiming that it disregarded Exhibit 17 merely because it did not have audio. (Appellant's Brief at 58). Rather, the district court found that Exhibit 17 did not show Ms. LaLande committing any violations of law, stating:

> Instead, it shows LaLande attempting to speak with and hand a pamphlet to a patient from the far side of three escorts for about ten seconds and then shows her attempting to do the same to a second patient from the far side of one escort for about 5 seconds. (Ex. 17.) The video has no audio, and neither patient had a visible reaction to LaLande's conduct. (Id.) Nothing in the video suggests that LaLande approached or followed the patients with an intent to harass, annoy, or alarm. (Id.)

(SPA50). The district court concluded that Exhibit 17 does not support a finding that Ms. LaLande followed and harassed individuals because of the absence of any unlawful conduct in the video, not the absence of audio as the Attorney General claims.

The Attorney General also misrepresented the content of the video. The Attorney General argues that the video shows Ms. LaLande "following patients at

---

Court consider the constitutionality of the follow and harass provision, Ms. Braxton and Ms. LaLande hereby incorporate by reference Section VII.F.2, law and arguments related to the unconstitutionality of the City Act, in the Griepp Defendants' Brief as an alternative basis for affirmation. Furthermore, as the Attorney General conceded that 90% of its case is under the follow and harass provision of the City Act, resolution of this issue would dispose of the vast majority of the case. (JA147-148).

extremely close distances . . . ." (Appellant's Brief at 58). This is a preposterous contention as, at every moment in the video, there is a Choices escort between Ms. LaLande and the patient. (Ex. 17). It defies logic to contend that Ms. LaLande was following patients at extremely close distances when another human being was between Ms. LaLande and the patient at all times.

> ii.     *Angela Braxton*

On appeal, the Attorney General only contends that Ms. Braxton followed and harassed a patient in a footnote. The footnote cites to a witness' testimony regarding an alleged incident that the witness admittedly did not see and an escort recap note. As explained above, *supra* I.A, the escort recap notes were correctly excluded from consideration. However, even if the court considered the recap notes and the farfetched account of a couple walking into oncoming traffic rather that listen to Ms. Braxton, this account could not support a finding that Ms. Braxton violated the City Act, which only makes it "unlawful for any person . . . (3) to follow and harass another person **within 15 feet of the premises** of a reproductive health care facility." NYC Admin. Code § 8-803 (emphasis added). As the sidewalk outside Choices is more than 15 feet wide, (JA192), conduct that allegedly occurred across the street

cannot support a finding that Ms. Braxton followed and harassed a person within 15 feet of Choices as she was indisputably more than 15 feet from the premises.[5]

## C.     Force

Ms. Braxton and Ms. LaLande hereby incorporate by reference Section VII.B.3, law and arguments related to force, in the Griepp Defendants' Brief and, in addition, state the following:

Yet again, the Attorney General misrepresents the district court's findings of fact in reference to Ms. LaLande's conduct in Exhibit 21. The district court absolutely did not "agree[] that defendants intentionally jostle with escorts in an attempt to force pamphlets into patients' hands or otherwise communicate with patients." (Appellant's Brief at 61) (citing (SPA71)). Rather, repeatedly throughout the page the Attorney General cites to support its contention, the district court finds the exact opposite. Instead the district court found that "it was not clear [whether the defendant or escort] initiated contact" but, "[i]n either case, [Exhibit 21] shows a quintessential incidental contact, because neither LaLande nor the escorts appear to be trying to create a collision . . . Rather, it appears that LaLande was trying to hand the patient a pamphlet while the escorts tried to block her access to the patient."

---

[5] Notably, the area where this incident allegedly occurred is recorded on Choices surveillance cameras, yet, the Attorney General did not present a video to corroborate the testimony.

(SPA71); (Ex. 21); *see also* (SPA50) ("Exhibit 21 shows accidental contact. Neither LaLande nor the escort appear to be trying to create a collision.").

The Attorney General also does not accurately describe the video. The Attorney General claims: "LaLande ran up to the escort and patient and wrested her arm over the escort's shoulder to thrust a pamphlet into the patient's hands, hitting the escort in the process." (Appellant's Brief at 60). This is not what the video shows at all. In Exhibit 21, an escort and alleged patient are approaching the entrance to Choices. Ms. LaLande then walks (not runs) toward the patient and escort, apparently attempting to hand a pamphlet to the patient. (Ex. 21). While Ms. LaLande is walking toward the escort and patient, a second escort comes running up behind Ms. LaLande, throws her elbow out, and collides with Ms. LaLande from behind to push between Ms. LaLande and the patient. (Ex. 21). If there is any intentional contact depicted in the video, it is by the second escort, not Ms. LaLande.

In any event, the video does not blatantly contradict the district court's finding in such a way that no reasonable fact finder could determine, based on Exhibit 21, that Ms. LaLande did not intentionally collide with the escort. *See Cameron*, 598 F.3d at 58.

### D.    Threat of Force

On appeal, there are no claims that either Ms. Braxton or Ms. LaLande made a threat of force.

III. **THE DISTRICT COURT CORRECTLY DETERMINED THAT DEFENDANTS WERE NOT LIKELY TO REPEAT ANY POTENTIALLY UNLAWFUL CONDUCT.**

The Attorney General's point on this topic is not applicable to Ms. Braxton or

Ms. LaLande. *See supra* fn. 1.

IV. **THE ATTORNEY GENERAL DOES NOT HAVE STANDING TO BRING A CLAIM UNDER THE CITY ACT.**

Ms. Braxton and Ms. LaLande hereby incorporate by reference Section VII.E,

law and arguments related to the Attorney General's lack of standing, in the Griepp

Defendants' Brief and in addition state the following:

Ms. Braxton and Ms. LaLande did not concede that the Attorney General has

standing to bring an action under the City Act if it can meet the elements of common

law *parens patriae* standing and the district court's finding such is clear error.

Indeed, at oral argument on this issue of whether the Attorney General had standing

to bring an action under the City Act, counsel for Ms. Braxton and Ms. LaLande

explained to the court that "the Court need only get to the idea or the test of *parens

patriae* if the statute explicitly authorizes the Attorney General to bring suit of [sic]

*parens patriae* [] or if it contains such a broad enforcement provision that anybody

who is injured [can bring an action]." (JA129-130). Counsel continued, explaining

to the Court that if, as is the case with the City Act, a statute is limited in who can

bring an action under it, the court does not even consider the *parens patriae* test,

citing to the court *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d

110, 121 (2d Cir. 2002). The district court should have first determined whether the City Act explicitly or implicitly grants the Attorney General standing to sue prior to considering *parens patriae* authority.

Therefore, the district court committed clear error in determining that Ms. Braxton and Ms. LaLande conceded that the Attorney General has standing to sue under the City Act if it can meet the elements of *parens patriae* standing and the district court should be reversed on this point.

## CONCLUSION

The Court should affirm the decision of the district court. In the alternative, the Court should determine that the Attorney General does not have standing to bring an action under the City Act.

Dated: March 5, 2019                    Respectfully submitted,

/s/ Kate Oliveri
Kate Oliveri
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
koliveri@thomasmore.org

*Attorney for Appellees/Cross-Appellants Angela Braxton and Jasmine LaLande*

30

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I hereby certify that the brief contains 6,930 words according to the word count function of the word processing program used to prepare this brief and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 28.1.1(b).

/s/ Kate Oliveri
Kate Oliveri